**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| EIREOG INNOVATIONS LTD., <br>          Plaintiff, <br><br> v. <br><br> DELL TECHNOLOGIES INC. and DELL INC., <br>          Defendants. | Case No. 1:24-cv-00416-DII <br><br> **JURY TRIAL DEMANDED** |
| EIREOG INNOVATIONS LTD., <br>          Plaintiff, <br><br> v. <br><br> HP INC., <br>          Defendant. | Case No. 1:24-cv-00644-DII <br><br> **JURY TRIAL DEMANDED** |
| EIREOG INNOVATIONS LTD., <br>          Plaintiff, <br><br> v. <br><br> ORACLE CORPORATION, <br>          Defendant. | Case No. 1:24-cv-00697-DII <br><br> **JURY TRIAL DEMANDED** |

**CONSOLIDATED OPENING CLAIM CONSTRUCTION BRIEF
OF DEFENDANTS DELL TECHNOLOGIES INC., DELL INC.,
HP INC., AND ORACLE CORPORATION**

# TABLE OF CONTENTS

**PAGE(S)**

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND ..................................................................................................1

   A.  U.S. Patent No. 8,117,399...........................................................................1

   B.  U.S. Patent Nos. 9,436,626 and 9,442,870 ................................................2

III.  DEFINITION OF PERSON OF ORDINARY SKILL IN THE ART ................5

IV.  DISPUTED TERMS ...........................................................................................5

   A.  No. 1: preamble ('399 patent claim 1) .......................................................5

   B.  No. 2: "a unified cache" ('399 patent claim 14) ........................................8

   C.  No. 3: "processor" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19)................10

   D.  No. 4: "interrupt identifier" ('626 patent claims 1, 14) .............................20

   E.  No. 5: "partition identifier" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19)...23

   F.  No. 6: "the first identifier" ('626 patent claims 9, 11)................................26

   G.  No. 7: "the hypervisor" ('626 patent claim 7) ...........................................29

V.  CONCLUSION...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbott Lab'ys v. Novopharm Ltd.*,
   323 F.3d 1324 (Fed. Cir. 2003)......................................................................................8

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
   533 F.3d 1362 (Fed. Cir. 2008)....................................................................................25

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010)....................................................................................17

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013)....................................................................................15

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
   813 F. App'x 522 (Fed. Cir. 2020) ...............................................................................28

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)........................................................................................5

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008)..............................................................................15, 16

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-0911-JRG-RSP, 2015 WL 6956722 (E.D. Tex. Nov. 9, 2015) ..........................6

*Digital Retail Apps, Inc. v. H-E-B, LP*,
   No. 6-19-CV-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) .................5, 6, 7, 30

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009)......................................................................................8

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
   No. 2:22-CV-00125-JRG, 2023 WL 4181266 (E.D. Tex. June 26, 2023) ..........................10

*Eon-Net LP v. Flagstar Bancorp*,
   653 F.3d 1314 (Fed. Cir. 2011)....................................................................................10

*In re Fought*,
   941 F.3d 1175 (Fed. Cir. 2019)......................................................................................6

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)....................................................................................26

*Int'l Bus. Machines Corp. v. Zynga Inc.*,
No. CV 22-590-GBW, 2023 WL 7129859 (D. Del. Oct. 30, 2023) ........................................ 22

*Japan Display Inc. v. Tianma Microelectronics Co.*,
No. 2:20-CV-0283-JRG, 2021 WL 12310745 (E.D. Tex. Sept. 3, 2021) ................................ 7

*Mars, Inc. v. TruRX LLC*,
No. 6:13-CV-526, 2015 WL 11232358 (E.D. Tex. Aug. 6, 2015) .......................................... 9

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
447 F. App'x 142 (Fed. Cir. 2011) ........................................................................................ 8

*Micropairing Techs. LLC v. Toyota Motor Mfg. Texas Inc.*,
No. SA-21-CV-00940-XR, 2022 WL 62540 (W.D. Tex. Jan. 5, 2022) ................................ 10

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ........................................................................................... 16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ............................................................................................................. 26

*Novo Industries, L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) ........................................................................................... 28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................................................... 10

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
383 F.3d 1303 (Fed. Cir. 2004) ............................................................................................. 8

*SourceProse Corp. v. AT & T Mobility, LLC*,
No. A-11-CV-117-LY, 2014 WL 2879694 (W.D. Tex. June 24, 2014) ................................ 16

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362, 1365 (Fed. Cir. 2012) ................................................................................. 21

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ........................................................................................... 17

*Ushijima v. Samsung Elecs. Co.*,
No. A-12-CV-318-LY, 2014 WL 4825373 (W.D. Tex. Jan. 6, 2014) .............................. 9, 16

*VARTA Microbattery GmbH v. Guangdong Mic-Power New Energy Co.*,
No. 2:21-CV-00036-JRG, 2022 WL 220103 (E.D. Tex. Jan. 25, 2022) ................................ 8

*Voice Techs. Grp., Inc. v. VMC Sys., Inc.*,
164 F.3d 605 (Fed. Cir. 1999) ............................................................................................. 20

- iii -

**Federal Statutes**

35 U.S.C. § 112 ..............................................................................................................26, 29

## I.    INTRODUCTION

Defendants have proposed constructions in view of the intrinsic record, including by giving due weight to definitional language in the patents and the applicants' clear and unmistakable statements during prosecution—all in accordance with well-established Federal Circuit law.  In contrast, Plaintiff simply asserts "no construction necessary" for every disputed term.  Plaintiff's motivation is evident in its treatment of the claims in its infringement contentions: Plaintiff seeks to expand the scope of the claims beyond what is supported by the intrinsic record and improperly attempts to recapture subject matter expressly disavowed during prosecution.

Additionally, two terms of U.S. Patent No. 9,436,626 ("the first identifier" and "the hypervisor") are indefinite because they lack antecedent basis and fail to inform those skilled in the art of the scope of the claims with reasonable certainty.  Rather than provide any meaning for these terms or request correction, Plaintiff again merely asserts only "no construction necessary."

As detailed further below, Defendants' proposed constructions should be adopted.

## II.    BACKGROUND

### A.    U.S. Patent No. 8,117,399[1]

The '399 patent is directed to managing information stored in a cache in a "processing device" (e.g., a microprocessor) with multiple individual processing units known as "cores."  Ex. 1 ('399) at 1:7-14.  A "cache" is a type of computer "memory" or storage space which facilitates fast access to information maintained on a temporary basis.  Ex. 2 (Random House Webster's Computer & Internet Dictionary 3rd Ed.) at 71.  Individual cores may "each maintain[]" a

---

[1] The '399 patent is not asserted against Defendant HP Inc.  Accordingly, the positions stated herein regarding the '399 patent are presented only on behalf of Defendants Dell Technologies Inc., Dell Inc., and Oracle Corporation.

"unified cache." Ex. 1 ('399) at 2:39-43. The patent explains that "unified caches" are

"configured to store both instruction information and data information." *Id.* at 1:14-17; *see also*

*id.* at 2:39-41 ("Some or all of the processor cores each maintains a backside unified cache (e.g.,

a level 2 (L2) cache) configured to store both instruction information and data information…").

The patent further asserts that instruction information "typically is not modified," whereas data

information "may have been modified in another cache." *Id.* at 2:13-20. The patent therefore

describes treating instruction and data information differently for the purpose of managing

unified caches. *Id.* at 2:21-30.

     **B.**     **U.S. Patent Nos. 9,436,626 and 9,442,870**

     The '626 and '870 patents are directed to managing "interrupts" in a "virtualized"

computer system. Ex. 3 ('626) at 1:8-11, 1:25-32; Ex. 4 ('870) at 1:8-11, 1:13-17.[2] As

described in the '626 and '870 patents, "virtualized" computer systems are those in which

"physical or hardware resources are divided into … partitions which virtually operate as a

separate computer…." Ex. 3 ('626) at 1:25-32; Ex. 4 ('870) at 1:13-15. "Interrupts" are events

generated by a device (such as a keyboard) that interrupt a computer processor's ongoing

operations. Ex. 2 (Random House Webster's Computer & Internet Dictionary 3rd Ed.) at 286.

     To overcome supposed problems in the prior art, the '626 and '870 patents describe a

"processor-based" approach for managing interrupts in a virtualized system. According to the

patents, prior art systems used structures called "interrupt controllers" to manage the

prioritization and ordering of interrupts that are sent to a processor—a process that the patents

refer to as "interrupt priority blocking." Ex. 3 ('626) at 1:18-24; Ex. 4 ('870) at 1:17-21. Figure

---

[2] Although not formally related, the '626 and '870 patents were applied for on the same day and
share the same named inventors and substantially similar specifications.

1 of the '626 patent shows a prior art system that includes an "interrupt controller 2" (in red) and a "physical processor 10" (in blue):



FIG. 1

Ex. 3 ('626), Figure 1, 1:54-58, 3:65-4:3; *see also* Ex. 4 ('870) Figure 1, 1:42-45, 3:21-31.  The prior art interrupt controller includes priority blocking registers (in yellow).

According to the '626 and '870 patents, relying on an "interrupt controller" to handle interrupt priority blocking "creates significant performance issues with partitioned/virtualized machines."  Ex. 3 ('626) at 1:33-35; Ex. 4 ('870) at 1:21-23.  In particular, the patents allege that locating "the interrupt priority blocking register 5 at the interrupt controller 2 creates a number of performance problems and signaling complexities" such as delays when routing interrupts to the target petitions and requiring separate interface signal lines.  Ex. 3 ('626) at 4:25-32; Ex. 4 ('870) at 3:40-46.

The patents' purported solution was to move these priority blocking registers from the interrupt controller to the "core" of the processor.  Ex. 3 ('626), Abstract ("[A] processor-based

partitioned priority blocking mechanism" with "special purpose registers [] *located at the processor core* …."); [3] Ex. 4 ('870), Abstract (same); Ex. 3 ('626) at 16:54-60; Ex. 4 ('870) at 12:6-15.  In particular, the patents describe a "virtualized interrupt management mechanism … at the physical processor … by introducing partition-based *in-core* blocking registers …."  Ex. 3 ('626) at 4:46-51; Ex. 4 ('870) at 3:54-58.

Figure 3 of the '626 patent shows the purported invention with the blocking functionality and related hardware registers (yellow) moved from the "interrupt controller 111" (in red) to a "processor core 141" (in blue):



FIG. 3

Ex. 3 ('626), Figure 3, 1:59-64, 4:46-63; *see also* Ex. 4 ('870) Figure 3, 1:56-50, 3:54-4:2.  As explained by the applicant during prosecution, the location of these registers "at each processor

---

[3] All emphases added unless otherwise noted.

<u>core</u>" was a key aspect of the alleged invention because the "design of the interrupt controller architecture is simplified to reduce access time and programming complexity …." Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 6 (emphasis in original); *see also* Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 10.

## III.    DEFINITION OF PERSON OF ORDINARY SKILL IN THE ART

For each of these patents, a person of ordinary skill in the art at the time of the alleged invention of the asserted patents would have at least (1) an undergraduate degree in computer science, electrical engineering, or an equivalent subject, together with three years of post-graduate experience in computer systems and architecture; or (2) a graduate degree in computer science, electrical engineering, or an equivalent subject, together with two years of post-graduate experience in computer systems and architecture. This description is approximate, and a higher level of education or skill might make up for less experience, and vice-versa.

## IV.    DISPUTED TERMS

### A.    No. 1: preamble ('399 patent claim 1)

| Term | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "In a processing device comprising a cache configured to store both instruction information and data information, a method comprising:" (claim 1) | preamble is limiting | no construction necessary |

The preamble of a patent claim is limiting when it "give[s] life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  In particular, a preamble is limiting if any of four conditions is met: (1) it provides antecedent basis for a subsequent claim limitation, (2) it is essential to understand another limitation in the body of the claim, (3) it recites "additional structure or steps underscored as

important by the specification," or (4) there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-CV-00167-ADA, 2020 WL 376664, at *7 (W.D. Tex. Jan. 23, 2020) (citing *Catalina Mktg.*, 289 F.3d at 808-09).

The preamble of claim 1 of the '399 patent is limiting because (1) it provides antecedent basis for a subsequent claim limitation; (2) it is essential to understanding other limitations in the body of the claim; and (3) it recites additional structure underscored as important by the specification. *See Digital Retail*, 2020 WL 376664, at *7; *see also Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-0911-JRG-RSP, 2015 WL 6956722, at *10 (E.D. Tex. Nov. 9, 2015) ("[T]he preamble provides both 'essential' elements and gives 'life, meaning, and vitality' to the claim. Based on either prong of the analysis, the preamble of claim 1 is limiting.").

**First**, the body of claim 1 recites "receiving, ***at the cache***, a first read access that is indexed to a first cacheline," with the antecedent basis for the term "the cache" being "a cache configured to store both instruction information and data information" as recited in the preamble. Ex. 1 ('399), claim 1. Accordingly, claim 1's preamble is limiting because it provides the necessary foundation for that which follows. *See In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019) ("We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim."); *see also Digital Retail Apps*, 2020 WL 376664, at *8 (preamble limiting where "terms within the claim body rely on the preamble for antecedent basis").

**Second**, the preamble is essential to understand another limitation in the body of the claim. *Digital Retail Apps*, 2020 WL 376664, at *8 (citing *Catalina Mktg.*, 289 F.3d at 808-09).

Indeed, ***every*** limitation of claim 1 relates to "the cache" or its constituent cachelines.  Ex. 1 ('399), claim 1 ("receiving, at the cache," "determining whether the first cacheline," "processing the first read access as a cache miss [or hit]"); *id.*, claim 2 ("processing the first read access as a cache hit"); *id.*, claim 3 ("processing the first read access as a cache hit").  Accordingly, the "preamble and body are used together to define the invention," and the preamble is limiting. *Japan Display Inc. v. Tianma Microelectronics Co.*, No. 2:20-CV-0283-JRG, 2021 WL 12310745, at *15 (E.D. Tex. Sept. 3, 2021) (construing preambles reciting "[a] display device comprising display area and used in a hand-held electronic device" as limiting because they "provide more than simply a statement of intended use, they reflect an important aspect of the described invention and are essential to properly understanding limitations in the claim body.").

   ***Third***, the preamble's statement that the "cache" recited in the body of the claim is "a cache configured to store both instruction information and data information" adds "structure or steps underscored as important by the specification."  *Digital Retail Apps*, 2020 WL 376664, at *7 (citing *Catalina Mktg.*, 289 F.3d at 808-09).  The '399 patent states that the alleged invention is directed to a "technique for managing coherency in a processing device implementing ***unified caches***," which it defines as "configured to store both instruction information and data information."  Ex. 1 ('399) at 1:14-26*; see also id.* at 1:38-48 ("FIG. 2 is a flow diagram illustrating a method for processing a write access to a ***unified cache***…. FIG. 3 is a diagram illustrating various examples of write accesses to a ***unified cache***…. FIG. 4 is a flow diagram illustrating a method for processing a read access to a ***unified cache***…."); *id.* at 2:39-43 ("Some or all of the processor cores each maintains a backside unified cache (e.g., a level 2 (L2) cache) configured to store both instruction information and data information"); *id.* at 3:32-35 (each cacheline illustrated in Figure 1 can "store one or both of instruction information and data

information"); *id.*, claim 10 ("In a processing device comprising a cache configured to store both instruction information and data information, a method comprising…").[4]

Thus, the preamble's statement that "the cache" is "a cache configured to store both instruction information and data information" is limiting because it adds an "'important characteristic of the claimed invention" "that is not otherwise present in the claim." *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 154 (Fed. Cir. 2011); *see also Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (affirming that the preamble was limiting based on numerous references in the specification and claims to the characteristic recited in the preamble); *VARTA Microbattery GmbH v. Guangdong Mic-Power New Energy Co.*, No. 2:21-CV-00036-JRG, 2022 WL 220103, at *5 (E.D. Tex. Jan. 25, 2022) (reference to "button cells" in preamble limiting because the patent "describes its disclosure as related to button cells rather than batteries generally").

### B.    No. 2: "a unified cache" ('399 patent claim 14)

| Term | Defendants' Construction | Plaintiff's Construction |
|------|--------------------------|--------------------------|
| "a unified cache" (claim 14) | "a cache configured to store both instruction information and data information" | no construction necessary |

The '399 patent expressly defines a "unified cache" as Defendants propose: "***i.e.***, configured to store both instruction information and data information." Ex. 1 ('399) at 1:12-17. Defendants' proposed construction is correct on that basis alone. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("[T]he specification's use of 'i.e.' signals an intent to define the word to which it refers ….."); *see also Abbott Lab'ys v. Novopharm Ltd.*, 323

---

[4] The '399 patent includes three independent claims.  Claim 1 and unasserted claim 10 include the preamble discussed here; claim 14 does not include the same preamble but recites a "unified cache," discussed below.

F.3d 1324, 1330 (Fed. Cir. 2003) (claim term "explicitly defined" by explanatory language following "i.e."); *Mars, Inc. v. TruRX LLC*, No. 6:13-CV-526, 2015 WL 11232358, at *6 (E.D. Tex. Aug. 6, 2015) (similar); *Ushijima v. Samsung Elecs. Co.*, No. A-12-CV-318-LY, 2014 WL 4825373, at *10 (W.D. Tex. Jan. 6, 2014) (similar).

Moreover, the fact that the claimed "unified cache" stores both instruction information and data information is fundamental to the entire disclosure of the '399 patent.  Specifically, the '399 patent describes techniques relating to retrieving "instructions" and "data" from the cache. *See* Ex. 1 ('399) at 2:13-26 ("Accordingly, in accordance to the techniques described herein, **instruction** fetches can hit on cachelines marked as either coherent or incoherent, whereas coherent **data** loads that hit on cachelines that store instruction information (or is otherwise marked as incoherent) will be returned as a cache miss.").  Thus, the specification consistently requires the claimed "unified cache" to store both data information and instruction information. *See id*. at 2:39-43 ("Some or all of the processor cores each maintains a backside ***unified cache*** (e.g., a level 2 (L2) cache) ***configured to store both instruction information and data information,*** such as backside caches 121, 122, 123, and 124 for processor cores 101, 102, 103, and 104, respectively."); *id.* at 3:4-9 (distinguishing separate data and instruction caches from a unified cache); *id*. at 6:9-15 ("In a set of write accesses, a cacheline of coherently acquired ***data information*** 313 is stored to the cacheline 151 (overwriting or evicting the instruction information 311), a cacheline of incoherently acquired ***instruction information*** 314 is stored to the cacheline 152, and a cacheline of coherently acquired ***data information*** 315**, *instruction information*** 316, and ***data information*** 317 is stored to the cacheline 154.").  Figure 3 in the specification further confirms that the claimed "unified cache" means a cache that stores both instructions and data:

*Id.*, Fig. 3.

This consistent usage further supports Defendants' proposed construction. *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321 (Fed. Cir. 2011) (construing terms consistent with how the "written description repeatedly and consistently defines the invention"); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998)) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (internal citations omitted)); *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-CV-00125-JRG, 2023 WL 4181266, at *22 (E.D. Tex. June 26, 2023); *Micropairing Techs. LLC v. Toyota Motor Mfg. Texas Inc.*, No. SA-21-CV-00940-XR, 2022 WL 62540, at *4-5 (W.D. Tex. Jan. 5, 2022).

**C.    No. 3: "processor" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19)**

| Term | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "processor" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19) | "processor core not including an interrupt controller" | no construction necessary |

Defendants' proposed construction of "processor" reflects the patentee's clear and unmistakable disclaimer of claim scope during prosecution to overcome the prior art. Defendants' proposed construction is further supported by the claim language, specification, and

inventor testimony.[5]  In contrast, Plaintiff's "no construction necessary" position would impermissibly allow Plaintiff to recapture subject matter expressly disclaimed during prosecution.

"Processor" is recited in each asserted independent claim of the '626 and '870 patents. Claim 1 of the '626 patent is representative and recites in relevant part:

> A method of managing interrupts **at a processor**, comprising:
>
> ***receiving* at the processor** an interrupt package ***provided by an interrupt controller*** …
>
> processing the interrupt package against one or more partitions running **on the processor** by comparing the priority value and partition identifier against at least a stored priority level and stored partition identifier retrieved from special purpose registers **at the processor** …

Ex. 3 ('626), claim 1; *see also id.*, claim 14, Ex. 4 ('870), claims 1, 12, 19.  As the claim language makes clear, certain operations must occur "at the processor," certain interrupt elements must be ***received*** "at the processor" ***from*** an interrupt controller, and certain registers must be located "at the processor."

The parties' respective constructions raise two issues regarding the scope of "processor"— ***first***, whether "processor" can include an "interrupt controller" itself located within a processor; and ***second***, whether "processor" means "processor core."  Regarding the first issue, the applicants' clear and unmistakable statements during prosecution disclaimed interrupt controllers located within a processor.  Regarding the second issue, the claimed "processor" must be a "processor core" based on the extensive support in the intrinsic record and

---

[5] Given the specific disclaimer in this case, Defendants need not address other aspects of the construction of the term "processor" as a general matter, including whether "processor" is a means-plus-function term.

as confirmed by testimony of Bryan Marietta, the first-named inventor of the '626 and '870

patents.

### 1.    The claimed "processor" cannot include an interrupt controller located within a processor

The claimed "processor" cannot be satisfied by an "interrupt controller" located within a

processor because (1) the applicant disclaimed such a configuration during prosecution, and (2)

the rest of the intrinsic record is consistent with the claimed "processor" not including an

"interrupt controller."  Indeed, the claim language recites "interrupt controller" and "processor"

as separate and distinct structural components—with the processor receiving an interrupt

package *from* the interrupt controller—and every embodiment in the specification shows the

interrupt controller as a separate component outside the processor.

*First*, the applicant disclaimed an "interrupt controller" located within the processor.

During prosecution of the '626 and '870 patents, the examiner rejected the then-pending claims

in view of U.S. Pub. No. 2008/0126652 to Vembu et al. ("Vembu").  Ex. 7 ('626 FH, 1/8/15

Non-Final Rejection) at 4-8, Ex. 8 ('870 FH, 9/23/14 Non-Final Rejection) at 2-8.  Vembu

describes "managing interrupts in a partitioned platform."  Ex. 9 (Vembu) at [0001].  In

particular, Vembu describes a multi-core processor in which "[e]ach core … may *include an

interrupt controller* configured to generate and receive interrupts[,]" called a "local advanced

programmable interrupt controller (LAPIC)" and "each respective LAPIC 114a, 114b, 114c and

114d may be configured to manage the interrupts of a respective core …."  *Id.* at [0011].

Because Vembu's interrupt controllers (LAPICs) are located within the processor, the

examiner cited the LAPIC disclosures from Vembu as meeting the "processor" limitations in

rejecting the then-pending claims of the '626 and '870 patents.  Ex. 7 ('626 FH, 1/8/15 Non-

Final Rejection) at 4, Ex. 8 ('870 FH, 9/23/14 Non-Final Rejection) at 2-3.  Specifically, as the

applicant recognized, "the Examiner assert[ed] that Vembu's 'local advanced programmable interrupt controller (LAPIC)' 114a, 114b, 114c meets the claim requirement of processing the interrupt package against partitions running on targeted virtual processors ***at the processor*** by comparing the first priority value and first partition identifier against at least a stored priority level and stored partition identifier retrieved from one or more special purpose registers ***at the processor*** to determine on a partition basis if the first physical interrupt request is blocked or forwarded to a targeted virtual processor." Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 7; Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11.

Even though Vembu's interrupt controllers are within a processor, to overcome Vembu, the applicant unequivocally argued that "Vembu's cited <u>interrupt controller</u> (e.g., LAPIC 114a) does <u>not</u> meet the claim requirement of a 'processor' for managing interrupts …." Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11 (emphasis in original); Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 7 ("Applicant respectfully points out that Vembu's cited interrupt controller (e.g., LAPIC1 114a) does not meet the claim requirement of a 'processor' ….").

The applicant emphasized that the patents "disclose[] and claim[] a ***processor-based*** interrupt priority management system" and that the purported advantages of the invention were due to "locating the special purpose hardware registers <u>at each processor core</u>." Ex. 5 ('870 FH, 12/23/14 Response) at 6 (emphases in original); *see also* Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 10. Thus, according to the applicant:

> Vembu fails to disclose at least the independent claim requirements that interrupt packages or requests ***from an interrupt controller are received*** and processed '<u>at a processor</u>' which includes 'special purpose registers at the processor' (claim 1) or 'a first hardware register at the processor' and 'one or more priority hardware registers at the processor' (claim 12). *See also*, claim 19 ('<u>a

> <u>processor</u> coupled to the partitioned interrupt controller <u>comprising</u>
> <u>one or more logical partition identifier registers, a hypervisor</u>
> <u>priority hardware register for storing a hypervisor priority level, and</u>
> <u>a guest priority hardware register for storing a guest priority level,</u>
> where <u>the processor</u> is configured ....').

Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 6-7 (underlined emphasis in

original), Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11 ("Vembu fails to

disclose at least the independent claim requirements that interrupt packages or requests ***from an***

***interrupt controller are received*** and processed '<u>at a processor</u>' which includes 'special purpose

registers at the processor' (claim 1) or 'a first hardware register at the processor' and 'one or

more priority hardware registers at the processor' (claim 14).") (underlined emphasis in original).

In other words, the applicant overcame the examiner's rejection by distinguishing Vembu

on the basis that Vembu disclosed managing interrupts at an interrupt controller (the LAPIC)

located on its processor. The applicant made clear that the claims were directed to a system in

which the interrupt controller was external to (and separate from) the processor, such that the

processor could "receive" interrupt packages or requests "from" the external interrupt controller.

*See* Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 6-7 ("Vembu fails to

disclose at least the independent claim requirements that interrupt packages or requests ***from*** an

interrupt controller are ***received*** and processed '***<u>at</u> <u>a processor</u>***'...."), Ex. 6 ('626 FH, 4/8/15

Response to Non-Final Office Action) at 11 (same). The requirement of "receiv[ing]" "***at*** a

processor" something "***from*** an interrupt controller" would make no sense in the context of a

system in which the processor itself comprises the interrupt controller; in such a system, the

processor would be ***generating*** the interrupt packages or requests with its internal interrupt

controller, not ***receiving*** them. According to these clear and unmistakable statements by the

applicant that resulted in allowance of the '626 and '870 patents, an interrupt controller located

within the processor (such as the LAPIC in Vembu) ***cannot*** satisfy the "processor" limitations.

- 14 -

In view of this disclaimer, Defendants' proposed construction is correct because otherwise the claim would be broadened beyond what the patent was awarded to cover. The public has the right to rely on the applicant's "definitive statements made during prosecution" which excluded interrupt controllers located within the processor. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (citing *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)).

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) is instructive. In *Computer Docking*, the Federal Circuit considered whether the district court had correctly construed the limitation "portable computer" to exclude computers with a "built-in display or keyboard." 519 F.3d at 1375. During prosecution, the examiner rejected several claims over a prior art reference called "Herron," which disclosed a laptop computer. *Id.* at 1372. To overcome this rejection, the applicants distinguished their claimed "portable computer" of its invention from "peripheral devices" such as keyboards and displays. *Id.* at 1376. The Federal Circuit found applicants' statements to "clearly distinguish[] their invention from computers with a built-in display or keyboard" and held that the "applicants' statements clearly and unambiguously disavowed computers with built-in displays and keyboard—that is, laptops." *Id.*

Here, just as the Herron prior art disclosed a laptop that included an integrated keyboard and display in *Computer Docking*, the Vembu prior art disclosed a processor that included an integrated interrupt controller (LAPIC). And just like *Computer Docking*, where the applicant argued that its "portable computer" does ***not*** include peripherals integrated with the computer to overcome the prior art, the applicant here argued that the claimed "processor" does ***not*** include an interrupt controller integrated within the processor to overcome the prior art. Thus, the

applicant's statements that "Vembu's cited <u>interrupt controller</u> (e.g., LAPIC 114a) does <u>not</u> meet the claim requirement of a 'processor' for managing interrupts" (Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11, Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 7) are clear and unmistakable prosecution disclaimer.  *Computer Docking*, 519 F.3d at 1374–75; *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350–51 (Fed. Cir. 2004) (applying prosecution disclaimer to construe "sending," "transmitting," and "receiving" to require "direct transmission of data packets … excluding the use of a packet-switched network such as the Internet" because applicants argued that its "voice packets do not circulate around a LAN but proceed directly from the communications system"); *Ushijima v. Samsung Elecs. Co.*, 2014 WL 4825373, at *9 (W.D. Tex. Jan. 6, 2014) (applying prosecution disclaimer to construe term "an elongated core" to be "exclusive of an EE or EI type core" where applicant argued during prosecution that "EI type and EE type core is never used"); *SourceProse Corp. v. AT & T Mobility, LLC*, No. A-11-CV-117-LY, 2014 WL 2879694, at *7 (W.D. Tex. June 24, 2014) (applying prosecution disclaimer to construe "georeferencing function" to mean "without using a lookup table or other predetermined correspondences" where applicant argued during prosecution that the prior art's "[u]se of a look up table" does not meet this limitation).

    ***Second***, the rest of the intrinsic record is consistent with applicant's disclaimer that the claimed "processor" does not include an "interrupt controller."  The claim language recites "interrupt controller" and "processor" as separate and distinct structural components.  For example, claim 1 of the '626 patent requires "***receiving*** at the processor an interrupt package provided by an interrupt controller" and claim 12 of the '870 patent requires an "interrupt controller to identify and ***present to*** the processor." Ex. 3 ('626), claim 1, Ex. 4 ('870), claim 12. If the "interrupt controller" were within the "processor," the processor would be sending

information to itself, not "receiving" or being "present[ed]" information.  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.").

Moreover, *every* embodiment in the specification shows a processor *without* an interrupt controller, where the interrupt controller is a separate component *outside* the processor.  Ex. 3 ('626), Figs. 1-3; Ex. 4 ('870), Figs. 1-3.  In fact, as explained above, the purported novelty of the patents was to use a "processor-based" interrupt management approach instead of an "interrupt controller" approach, which supposedly provided advantages over the prior art.  *See supra* Section II.B.  Conflating the processor and interrupt controller would thus contradict the embodiments and undermine the purported advantages of moving away from interrupt controllers as set forth in the specification.  *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("[T]he specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.").

In sum, based on the entire intrinsic record, the claimed "processor" does not include an interrupt controller, as Defendants' proposed construction makes clear.

### 2.    The "processor" is a "processor core"

Based on the entirety of the intrinsic record, the term "processor," as used in the claims of the '626 and '870 patents, means a "processor core."

*First*, the specifications of the '626 and '870 patents repeatedly and consistently describe the claimed "processor" as a "processor core."  For example, the "registers" that the claims require to be "at the processor" are consistently described as being at the "processor *core*."  *See, e.g.*, Ex. 3 ('626), Abstract ("special purpose registers (35-38) located at the *processor core*");

- 17 -

2:20 ("uses *processor core* registers"); 2:38-47 ("stored in *processor core* registers (e.g., logical partition ID registers) … partition ID *processor core* register … a selected *processor core* register (e.g., an Interrupt Priority Level Register) … one or more *processor core* registers"); 4:46-51 ("To reduce the software overhead, circuit complexity, and access delays, a virtualized interrupt management mechanism is provided at the physical processor for quickly and efficiently processing interrupt requests at the targeted *processor core* by introducing partition-based *in-core* blocking registers"); 8:38-39 ("the *processor core 141* includes special purpose registers 144"); 16:54-58 ("As will be appreciated, the processor-based partitioned priority blocking mechanism and programming model disclosed herein provide a quick and efficient mechanism for managing interrupt priority blocking on a partition basis using special purpose registers *at the processor core*"); Figure 3 (showing registers located at the "PROCESSOR *CORE* 141"); Ex. 4 ('870), Abstract (special purpose registers (27-29) located at the *processor core*); 2:2-4 ("using one or more special purpose priority blocking registers *at the processor core*"); 2:9-14 ("one or more *processor core* registers … select one of the *processor core registers*"); 4:51-56 ("FIG. 3 [] depicts a simplified block diagram of a data processing system 100 … wherein special purpose registers at *a processor core (e.g., 141)* are used"); 12:6-10 ("As will be appreciated, the processor-based partitioned priority blocking mechanism and programming model disclosed herein provide a quick and efficient mechanism for managing interrupt priority blocking on a partition basis using special purpose registers at the *processor core*."); Figure 3 (showing registers located at the "PROCESSOR *CORE* 141"). Similarly, the specifications describe the claimed "receiving" is at the "processor *core*." *See, e.g.*, Ex. 3 ('626), 7:42-43 ("interrupt message data 136 which are provided by the interrupt controller interface 112 to *processor core 141*"); 9:16-17 ("An interrupt that is presented to *the processor core 141*").

Ex. 4 ('870), 2:11-12 ("When an interrupt request is presented to the *processor core*"); 2:21 ("presented to the *processor core*"); 7:60 ("presented to the *processor core*"); 8:2 ("presented to the *processor core 141*").

*Second*, during prosecution, the applicant repeatedly emphasized that the purported invention requires registers to be located at the "processor *core*."  For example, during prosecution of the '870 patent, the applicant specifically emphasized "processor core" when describing the invention to distinguish prior art.  Ex. 5 ('870 FH, 12/23/14 Response to Non-Final Office Action) at 6 ("By locating the special purpose hardware registers <u>at each processor core</u>, the design of the interrupt controller architecture is simplified to reduce access time and programming complexity associated with changing the blocking conditions at the interrupt controller and performing partition-based priority blocking.") (emphasis in original).  Further, in arguing distinctions over Vembu, the applicant additionally argued that Vembu did not disclose "special purpose registers at the processor," namely, "at any *processor core*, such as CPU 107a-d …."  *Id.* at 7, Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11.  These statements confirm that the inventors viewed locating the register at the "core" of the processor was a distinguishing element of the purported invention.

*Third* and finally, the first-named inventor's testimony is consistent with the intrinsic evidence that "processor" as used in the claims means "processor core."  During his deposition, the first-named inventor Mr. Marietta explained that the claim term "special-purpose registers at the processor" refers to "*core* internal registers" which are "internal to the *core*," and means that they are "inside the processor *core* itself" as "opposed to being located somewhere else[.]"  Ex. 10 (Marietta Dep.) at 53:5-24.  Thus, the inventor's testimony further supports Defendants' construction.  *Voice Techs. Grp., Inc. v. VMC Sys., Inc.,* 164 F.3d 605, 615 (Fed. Cir. 1999) ("An

inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims.").

\* \* \*

For the foregoing reasons, the Court should adopt Defendants' proposed construction of "processor" to mean "processor core not including an interrupt controller."

### D.    No. 4: "interrupt identifier" ('626 patent claims 1, 14)

| Term | Defendants' Construction | Plaintiff's Construction |
|------|--------------------------|--------------------------|
| "interrupt identifier" (claims 1, 14) | "a value that uniquely identifies an interrupt request" | no construction necessary |

The specification expressly defines the term "interrupt identifier" as "any value ***that uniquely identifies*** the interrupt request." Ex. 3 ('626) at 14:16-20 ("The interrupt identifier or tag may be generated in any desired manner, and can be any value ***that uniquely identifies*** the interrupt request."). The specification then doubles down on this description proclaiming that "the interrupt ID is ***guaranteed to be unique*** for a given partition…" *Id.*[6] Thus, the specification makes clear that the claimed "interrupt identifier" is not any value that is merely related to an interrupt or any value that could possibly be used to identify a group or category of interrupts, but rather, it is a value that "***uniquely*** identifies" a particular interrupt.

These unambiguous statements in the specification are textbook lexicography. To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner v. Sony Comput. Ent. Am.*

---

[6] The specification explains that "interrupt identifier" and "interrupt ID" are used interchangeably. *See id.* at 14:15 ("an interrupt identifier, or ID"). Further, while the specification explains that an interrupt ID can be "used again" after the "interrupt ID has been serviced," the interrupt ID is never described as anything other than a unique value that uniquely identifies one and only one interrupt at any given time. *Id.* at 14:27-30.

*LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Here, the patent applicant defines the interrupt identifier as "any value that uniquely identifies the interrupt request." Ex. 3 ('626) at 14:17-20. Any potential doubt as to the definitional nature of this statement is resolved by the very next sentence where the applicant confirms that the "interrupt ID is ***guaranteed*** to be unique…." *Id.* It is difficult to envision a more definitional statement than an unrestricted guarantee from the applicant that a claim term will have a particular scope. Moreover, these statements are not described as being limited to any particular embodiment—even stating that the interrupt identifier "may be generated in any desired manner," and thus rendering the applicant's definition applicable to any embodiment. *Id.*

Further, even aside from the foregoing definitional statements, any construction that does not require the identifier to be "unique" should be rejected because a non-unique identifier would fail to accomplish its stated purpose—that is, to identify a particular interrupt. This case is analogous to *Fotomedia Techs., LLC v. AOL, LLC*, where Judge Everingham construed the more general term "identifier." 2009 WL 2175845, at *9 (E.D. Tex. July 21, 2009). Similar to the present case, the patent at issue in the *Fotomedia* case described a "unique identifier" that "uniquely specifies that particular electronic postcard." *Id.* In finding that the claimed identifier should be construed to be "information uniquely identifying image data," the Court recognized that a non-unique identifier would "fail in its utility by the patentee's own definition." *Id.* Similarly, in the present case, a non-unique identifier would fail to achieve the very functionality set forth in the specification for the "interrupt identifier." *See also Int'l Bus. Machines Corp. v. Zynga Inc.*, No. CV 22-590-GBW, 2023 WL 7129859, at *7 (D. Del. Oct. 30, 2023) (construing "identifier associated with the user" to mean "information that uniquely identifies the user").

Plaintiff's position that the term "interrupt identifier" does not need construction should be rejected. By not seeking a construction, Plaintiff improperly seeks to broadly apply the term "interrupt identifier" to read on non-unique pieces of information in the accused products and to conflate the term with other separately recited terms like "priority value." *See, e.g.*, Ex. 11 (Dell Infringement Contentions, Ex. E) at 9, 20-21 (arguing that an "interrupt vector" is both an "interrupt identifier" and a "priority value"); Ex. 12 (Oracle Infringement Contentions, Ex. E) at 10, 21-22 (same); Ex. 13 (HP Inc. Infringement Contentions, Ex. A) at 10, 21-22 (same). In other words, by not seeking construction, Plaintiff attempts to implicitly interpret the term "interrupt identifier" to broadly cover any value that merely relates somehow to an interrupt.

But Plaintiff's apparent application of the term is contrary to the claims and specification. As described above in the discussion of the term "processor," in both the specification and in the file history, the patent applicants stressed repeatedly that their purported invention involved shifting the processing of interrupts from the interrupt controller to the processor core itself. Ex. 6 ('626 FH, 4/8/15 Response to Non-Final Office Action) at 11; Ex. 3 ('626) at 2:18-23 (describing the claimed invention as using "processor core registers to evaluate partition ownership information, priority, and interrupt IDs delivered directly with the interrupt request"); *see also supra* Section II.B. To enable such a system, the '626 patent describes the use of an "interrupt package" comprising distinct components. As shown, there are three different identifiers, including an interrupt identifier 132, a logical partition identifier ("LPID") 133, and an interrupt thread identifier ("VPID") 133. *See* Ex. 3 ('626) at 7:38-42.[7] Beyond these identifiers, the interrupt package can also contain an interrupt request 131 and an interrupt

---

[7] The specification of the '626 patent also describes the use of another identifier known as an interrupt source identifier. *See* Ex. 3 ('626) at 13:57-59.

priority 135. Notably, claim 1 of the '626 patent individually recites each of these five

components of the interrupt package:

> **1**. A method of managing interrupts at a processor, comprising:
> receiving at the processor an interrupt package provided by an interrupt controller, where the interrupt package comprises a first <u>interrupt request,</u>[1] an <u>interrupt identifier</u>[2] corresponding to the first interrupt request, a <u>partition identifier</u>[3] identifying a partition at the processor associated with the first interrupt request, a <u>priority value</u>[4] corresponding to the first interrupt request, and a <u>thread identifier</u>[5] identifying a thread at the processor for the first interrupt request; and

Because each component is part of the purported improvement of the patents, it is critical

that the metes and bounds of each of the claimed identifiers be clearly set forth. As explained

above, the metes and bounds of "interrupt identifier" are clearly defined as a value that uniquely

identifies an interrupt.

### E.    No. 5: "partition identifier" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19)

| Term | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "partition identifier" ('626 patent claims 1, 14; '870 patent claims 1, 12, 19) | "a value that identifies an instance of a virtual machine" | no construction necessary |

Defendant's proposed construction of "partition identifier" is consistent with the

specification and Plaintiff's own definition set forth in its infringement contentions.

***First***, the specifications consistently describe a "partition" in relation to "virtual

machines." For example, the specifications describe a "partition" as one that "virtually

operate[s] as a separate computer" or runs a "virtual computing machine." *See* Ex. 4 ('870) at

1:12-14 (describing "logical partitions which virtually operate as a separate computer"); Ex. 3

('626) at 1:29-30 (same); Ex. 3 ('626) at 7:1-6 ("Using virtualization, the data processing system

300 can be organized into one or more logical partitions … so that a single ***virtual computing***

*machine runs on a single local partition* on one or more virtual processors"); Ex. 4 ('870) at 5:38-41 ("Using virtualization, the data processing system 100 can be organized into one or more logical partitions to represent a collection of actual or emulated hardware resources so that a single *virtual computing machine runs on a single logical partition*.").  Further, the specifications consistently equate a "partitioned" system with a "virtualized" system.  Ex. 3 ('626) at 1:26 (referencing "a *partitioned / virtualized* system"); Ex. 4 ('870) at 1:22-23 (same); Ex. 3 ('626) at 3:40-41 (referencing "*partitioned or virtualized* machines"); Ex. 4 ('870) at 3:5-6 (same); *see also* Ex. 3 ('626) at 4:47-51 (describing a "*virtualized* interrupt management mechanism" having "*partition*-based in-core blocking registers"); Ex. 4 ('870) at 3:54-58 ("To reduce the software overhead and complexity for interrupt management and/or partition management, a *partitioned* priority blocking mechanism is provided at the *virtual* core for quickly and efficiently performing priority blocking at the targeted processor.").  Thus, as used in the specification, a "partition" is an instance of a virtual machine, as Defendants propose.

     *Second*, Plaintiff previously agreed with Defendants' definition of "partition."  In its infringement contentions for the '870 patent, Plaintiff contends that "[t]he '870 Patent specification describes a 'partition' *as an instance of a Virtual Machine* (VM)."  Ex. 14 (Dell Infringement Contentions, Ex. G) at 75; Ex. 15 (Oracle Infringement Contentions, Ex. G) at 76; Ex. 16 (HP Inc. Infringement Contentions, Ex. C) at 76.  Plaintiff made the same assertion in its contentions for the '626 Patent, again stating that "the '626 Patent describes a 'partition' *as an instance of a Virtual Machine* (VM)."  Ex. 11 (Dell Infringement Contentions, Ex. E) at 10; Ex. 12 (Oracle Infringement Contentions, Ex. E) at 11; Ex. 13 (HP Inc. Infringement Contentions, Ex. A) at 11.  Thus, there is no actual dispute between the parties that a partition is "an instance

of a virtual machine," and hence no plausible basis for Plaintiff to dispute that a partition identifier is a value that identifies an instance of a virtual machine, as Defendants propose.

Plaintiff's proposal to not construe "partition identifier" is untenable, because otherwise, the metes and bounds of the term would be left unclear. One needs to look no further than the recited "thread identifier" to see the problem. The plain meaning of partition divorced from the specification is contained within the word itself, namely a "part." Yet individual threads are each a "part" of the processor as well. *See, e.g.*, Ex. 3 ('626) at 5:65-66 (describing the "target thread within the processor core"). However, as per the claim language, a "thread identifier" is separate and distinct from a "partition identifier." *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings."). Despite being a part of the processor, a thread is not a partition, and thus a thread identifier is not a partition identifier. Yet, without clear metes and bounds, a partition identifier could erroneously be argued to be a thread identifier. By further example, the '626 and '870 patents describe the processor cores as including a host of special purpose registers 144-151. *See, e.g.*, Ex. 3 ('626) at 8:37-42, 9:65-10:18. While these registers may be a part of the processor cores, they are also separately claimed and not partitions on their own. Thus, leaving the term unconstrued as proposed by Plaintiff provides no clarity as to what constitutes a partition or a partition identifier. Accordingly, the court should construe the term "partition identifier" to mean "a value that identifies an instance of a virtual machine," which is consistent both with the specification and Plaintiff's infringement contention definition.

### F.    No. 6: "the first identifier" ('626 patent claims 9, 11)

| Term | Defendants' Construction | Plaintiff's Construction |
|------|--------------------------|--------------------------|
| "the first identifier" (claims 9, 11) | indefinite | no construction necessary |

The term "the first identifier" (recited in claims 9 and 11) is indefinite under 35 U.S.C. § 112 because there is no antecedent basis and a person of ordinary skill would not be able to discern with reasonable certainty what "*the* first identifier" refers to, among multiple possible "identifiers" recited earlier in claim 1, from which claims 9 and 11 depend.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). A particular circumstance in which claims are found indefinite is when "a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Here, the claims and intrinsic record fail to inform with reasonable certainty the scope of claims 9 and 11 because a person of ordinary skill is not able to reasonably ascertain which of many claimed "identifiers" the term "the first identifier" refers to.

Claims 9 and 11 each recite "the first identifier" without any antecedent basis:

> 9. The method of claim 7, where processing the interrupt package comprises signaling the first interrupt request to the targeted thread identified by the thread identifier if ***the first identifier*** does not match a stored partition identifier retrieved from special purpose registers and the priority value exceeds the first priority level retrieved from the first hardware priority blocking register.

> 11. The method of claim 7, where processing the interrupt package comprises signaling the first interrupt request to the targeted thread identified by the thread identifier if ***the first identifier*** matches a stored partition identifier retrieved from special purpose registers

> and the priority value exceeds the second priority level retrieved
> from the second hardware blocking register.

Ex. 3 ('626), claims 9, 11.

Both claims 9 and 11 depend from claim 7, which in turn depends from claim 1. Neither claim 1 nor 7 recites "a first identifier," but rather claim 1 recites four *different* identifiers:

- "an interrupt identifier";
- "a partition identifier";
- "a thread identifier"; and
- "[a] stored partition identifier."

Ex. 3 ('626), claim 1.

Thus, "the first identifier" recited in claims 9 and 11 is ambiguous and subject to multiple reasonable interpretations. It could refer to the previously claimed "an interrupt identifier," because "an interrupt identifier" is the first recited identifier in claim. Or it could also refer to the previously claimed "a partition identifier," because claims 9 and 11 recite comparison with a "stored partitioned identifier." Or it could also refer to the previously claimed "thread identifier" because claims 9 and 11 recite the "thread identifier" immediately before "the first identifier." Finally, it could refer to "[a] stored partition identifier" in claim 1, because claims 9 and 11 recite comparison with a "stored partition identifier" and the claims could require a comparison between two stored partition identifiers. Because "the first identifier" can reasonably refer to any of these multiple previously-recited identifiers, a person of ordinary skill in the art would not know which of the multiple previously-recited identifiers "the first identifier" refers to.

The rest of the intrinsic record fails to provide any clarity. The specification refers to "the first identifier" only twice and simply mirrors the ambiguous claim language. Ex. 3 ('626)

at 18:19-28.  And the prosecution history does not include any discussion of "the first identifier," much less provide any clarity as to which of the various types of identifiers the term refers.[8]

The Federal Circuit has found indefiniteness in analogous circumstances.  For example, in *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522 (Fed. Cir. 2020) (nonprecedential), the issue was whether the term "said different IP address" is indefinite for lacking antecedent basis.  813 F. App'x at 526-27.  In holding the term indefinite, the Federal Circuit found that not only did the claim lack antecedent basis, but there were three different classes of IP addresses recited in the claim and "[w]ith three different IP addresses to choose from, a POSA faced with the 'said different IP Address' limitation is left to wonder which of the different IP addresses is 'said' different one."  *Id.* at 526.  The Federal Circuit further determined that the specification did "not clarify the meaning" and concluded that "[a] POSA, faced with the claims and the specification, could not, with reasonable certainty, discern the meaning of the claim term."  *Id.* at 527.  Here, just as in *Bushnell*, a person of ordinary skill would be "left to wonder" which of the different identifiers is the "the first identifier" and the rest of the intrinsic record "does not clarify the meaning."  *Bushnell*, 813 F. App'x at 526-27.

For the foregoing reasons, the term "the first identifier" is indefinite.

---

[8] Moreover, because "the first identifier" is amenable to multiple, reasonable interpretations in view of the specification and claim language as a whole, the term is not merely a typographical error amenable to judicial correction.  *See Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (explaining that while "courts can continue to correct obvious minor typographical and clerical errors in patents," correction is proper "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification…."). In any event, EireOg has not requested correction.

### G.    No. 7: "the hypervisor" ('626 patent claim 7)

| Term | Defendants' Construction | Plaintiff's Construction |
|------|--------------------------|--------------------------|
| "the hypervisor" (claim 7) | indefinite | no construction necessary |

The term "***the*** hypervisor" is indefinite under 35 U.S.C. § 112 because there is no antecedent basis, and a person of ordinary skill would not understand the scope of the claims with reasonable certainty.

Claim 7 recites "the hypervisor" without any antecedent basis:

> 7.  The method of claim 1, where the special purpose registers at the processor comprise:
>
> a first hardware priority blocking register for storing a first priority level corresponding to ***the hypervisor running on the processor***; and
>
> a second hardware priority blocking register for storing a second priority level corresponding to an active guest running on the processor.

Ex. 3 ('626), claim 7.

Claim 7 depends from the "method of claim 1," but claim 1 also does not recite any "hypervisor" or otherwise provide antecedent basis with reasonable certainty.  Ex. 3 ('626), claim 1.  Thus, it not reasonably certain what limitation in claim 1 "the hypervisor" is referring to because the method of claim 1 is completely silent as to whether a hypervisor is "running on the processor."

The specification only compounds the ambiguity.  For example, the specification describes "enabling the interrupt management system to directly deliver interrupts and their associated context information to the target partition ***without intervention by a hypervisor program***."  Ex. 3 ('626) at 2:32-34; *id.* at 2:34-37 ("At the processor, the received partition ID is used to take the interrupt in the appropriate target partition directly ***without hypervisor***

*intervention*….").  Thus, the specification suggests that claim 1's "method of managing interrupts" does not require a hypervisor to be actively running to intervene, but claim 7's recitation of "the hypervisor running on the processor" implies otherwise.

Thus, a person of ordinary skill cannot discern with reasonable certainty what "the hypervisor" refers to, rendering the claim indefinite.  *See Digital Retail Apps, Inc., v. H-E-B, LP*, No. 6-19-cv-00167-ADA, 2020 WL 376664, at n.7 (W.D. Tex. Jan. 23, 2020) ("Claims 3-5 ('506 Patent), which include the disputed terms above, depend from Claim 1 and recited 'the purchase information.' '506 Patent at Cl. 1, 3–5. However, Claim 1 does not disclose 'purchase information.' Therefore, 'the purchase information' in Claims 3–5 lack an antecedent basis, rendering those claims invalid for that reason as well.").[9]

## V.    CONCLUSION

For the foregoing reasons, Defendants' proposed constructions should be adopted.

---

[9] To the extent that Plaintiff contends that "the hypervisor" is an obvious minor typographical that the Court can correct via claim construction as "a hypervisor," Plaintiff has waived such an argument by proposing that no construction is necessary, rather than requesting a corrective construction for "a hypervisor."

Respectfully submitted,

February 28, 2025                                        /s/Gregory H. Lantier

David M. Hoffman (TX Bar No. 24046084)          Joseph J. Mueller
hoffman@fr.com                                  Dominic E. Massa
111 Congress Avenue, Suite 2000                 Cynthia D. Vreeland (TX Bar No. 20625150)
Austin, TX 78701                                Louis W. Tompros
Phone: 512-472-5070                             Sarah R. Frazier
                                                Jason H. Liss
Aaron P. Pirouznia (TX Bar No. 24098958)        60 State Street
pirouznia@fr.com                                Boston, MA 02109
1717 Main Street, Suite 5000                    Phone: (617) 526-6000
Dallas, TX 75201                                Joseph.Mueller@wilmerhale.com
Phone: 214-747-5070                             Dominic.Massa@wilmerhale.com
                                                Cynthia.Vreeland@wilmerhale.com
Jeffrey Shneidman                               Louis.Tompros@wilmerhale.com
shneidman@fr.com                                Sarah.Frazier@wilmerhale.com
One Marina Park Drive                           Jason.Liss@wilmerhale.com
Boston, MA 02210
Phone: 617-542-5070                             Gregory H. Lantier
                                                2100 Pennsylvania Avenue, NW
FISH & RICHARDSON P.C.                          Washington, DC 20037
                                                Phone: (202) 663-6327
*Counsel for Defendants Dell Technologies*      Gregory.Lantier@wilmerhale.com
*Inc., Dell Inc., and HP Inc.*
                                                WILMER CUTLER PICKERING
                                                HALE AND DORR LLP

                                                *Counsel for Defendants*

Brian C. Nash (TX Bar No. 24051103)             Harper S. Batts
MORRISON & FOERSTER LLP                          Jeffrey Liang
300 Colorado Street, Suite 1800                 Christopher Ponder
Austin, TX 78701                                SHEPPARD, MULLIN, RICHTER &
Phone: (512) 617-0650                           HAMPTON LLP
bnash@mofo.com                                   1540 El Camino Real, Suite 120
                                                Menlo Park, CA 94025
*Counsel for Defendants Dell Technologies*      Phone: (650) 815-2600
*Inc., Dell Inc., and Oracle Corporation*       hbatts@sheppardmullin.com
                                                jliang@sheppardmullin.com
                                                cponder@sheppardmullin.com

                                                *Counsel for Defendant Oracle Corporation*